Gerry B. HILL, Plaintiff,

v.

PFIZER, INC., Defendant.

No. 3:01CV1546(GLG).

United States District Court,
D. Connecticut.

June 3, 2003.

Green, Epstein, Becker & Green, P.C., New York City, for Pfizer, Inc.

## *OPINION*

GOETTEL, District Judge.

Plaintiff, Gerry B. Hill, has brought a three-count complaint against his former employer, Pfizer, Inc., alleging unlawful discrimination on the basis of a perceived disability[1] in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.* ("ADA"), and Connecticut's Fair Employment Practices Act ("CFEPA"), Conn. Gen.Stat. § 46a–51(15) and § 46a–60 *et seq.*, and in retaliation for his receipt of workers' compensation benefits, in violation of Connecticut's Workers' Compensation Act, Conn. Gen.Stat. § 31–290a. Defendant has moved for summary judgment [Doc. # 24] on all counts of plaintiff's complaint. Finding genuine issues of material fact, we deny defendant's motion for summary judgment.

## *Summary Judgment Standard*

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law," Fed.R.Civ.P. 56(c), *i.e.*, "[w]here the rec-

Morris James Busca, Gesmonde, Pietresimone, Sgrignari, Pinkus & Sachs, Hamden, CT, for plaintiff.

Mary A. Gambardella, Epstein, Becker & Green, P.C., Stamford, CT, Ronald M.

---

1. Although plaintiff's complaint alleges discrimination because plaintiff "(1) suffered from a physical impairment that substantially limited the major life activity of lifting, (2) had a record of such impairment, or (3) was regarded by the defendant as having such an impairment," (Pl.'s Comp. ¶ 35), in his opposition papers to the motion for summary judgment, he relies solely on the "regarded as" prong of the definition of "disability" under the ADA. 42 U.S.C. § 12102(2)(C). He states "[a]lthough Hill suffered permanent partial disabilities to his wrists and his back and *he was not substantially limited in the major life activity of lifting,* he was regarded as or perceived as disabled by the defendant." (Pl.'s Opp'n Mem. at 1 (emphasis added).) He fur-

ther states, "[a]s alleged in his complaint, Hill relies on the third alternative under the definition that he was regarded as having a physical impairment that substantially limited the major life activity of lifting." (*Id.* at 19.) Nowhere in his opposition papers does he argue that he was disabled by virtue of a physical impairment that substantially limited a major life activity. Additionally, he does not base his claim of disability discrimination on having a record of such an impairment. Accordingly, we have treated his ADA claim as limited solely to the third prong of the definition of disability, that is, "being regarded as having such an impairment." 42 U.S.C. § 12102(2)(C).

ord taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A fact is "material" for these purposes if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* In deciding the motion, this Court must first resolve all ambiguities and draw all reasonable inferences in favor of plaintiff as the non-moving party, and must then determine whether a rational jury could find for the plaintiff. *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223–24 (2d Cir.1994). This Court's "function at this stage is to identify issues to be tried, not decide them." *Graham v. Long Island R.R.,* 230 F.3d 34, 38 (2d Cir.2000).

### Facts

Plaintiff's employment with Pfizer dates back to December 13, 1982, when he began working as a Process Technician in the Fermentation Department. According to the job description for that position, the job involved unskilled, partially trained work in the operation, servicing, and maintenance of equipment and required the employee to lift up to 50 pounds between four and five hours daily. (Pl.'s Ex. 2.)

In 1988, in an incident unrelated to work, plaintiff sustained an injury to his back, which required surgery for the removal of a ruptured disc at L5–S1. After a leave of absence, plaintiff returned to his former job. Six years later, plaintiff suffered an occupational injury, bilateral carpal tunnel syndrome, for which he received workers' compensation benefits based upon a permanent partial disability rating of 9% to his dominant right hand and 3.5% to his left hand. (Pl.'s Ex. 3.) Plaintiff returned to work on light duty in April, 1997. (Pl.'s Ex. 4, ¶ 7.) Shortly thereafter, on May 30, 1997, plaintiff suffered another on-the-job injury to his lower back, while lifting a 60–pound hatch cover on a chemical mixing tank. (Pl.'s Ex. 4, ¶ 12.) Again, he received workers' compensation benefits. Ultimately, he was given an 11% permanent partial disability rating to his lumbar spine. (Pl.'s Ex. 3.) Additionally, from May 30, 1997, to November 23, 1999, plaintiff received short-term disability benefits, followed by long-term disability benefits. (Pl.'s Ex. 4, ¶ 17.)

During the course of plaintiff's treatment for his back problems and carpal tunnel syndrome, there were a number of communications between plaintiff's treating physicians and Pfizer. According to Kathleen Tourjee in Employee Relations at Pfizer, all medical records and communications from plaintiff's doctors would have been kept by the Medical Department and would not have been part of his personnel file. (Tourjee Dep. at 102.)

Following his back injury, plaintiff's treating physician, Dr. Stanley Pugsley, a neurosurgeon, informed Pfizer physician, Dr. Paul Kanfer, that as of July 16, 1997, plaintiff should not lift more than 10 pounds, nor should he lift or bend repeatedly. On January 13, 1998, Dr. Pugsley again wrote Pfizer that plaintiff could lift only a few pounds and that he had reached maximum medical improvement. He indicated that plaintiff was being referred to the State Vocational Rehabilitation Services for an employment evaluation, which Dr. Pugsley believed would be limited to sedentary activity. On February 3, 1998, Dr. Pugsley released plaintiff to sedentary employment. (Def.'s Ex. 9.) Dr. Pugsley stated that he "suspect[ed]

that ultimately his restrictions will be more liberal than that but at this early stage after initiating treatment with Elavil it is too soon to say." (Def.'s Ex. 10.)

In 1998, Dr. Cherry, plaintiff's treating physician for his carpal tunnel syndrome, recommended that plaintiff permanently refrain from repetitive lifting or assembly-type work, or overhead work greater than 20 pounds. He gave plaintiff à 12% permanent partial disability rating to his right hand. (Def.'s Ex. 11.)

In early May of 1998, while still on disability leave, plaintiff responded to an internal posting for four vacancies as an Animal Resources Tech IV ("ART"), which required less lifting than his former position. The ART position description stated that the job involved participating in the routine handling, feeding, transportation, and care of laboratory animals, including the transportation of animal cages. (Pl.'s Ex. 7.) It required lifting of 50 pounds. (*Id.*) Before applying for the position, plaintiff sought Dr. Pugsley's opinion as to whether he thought plaintiff could perform the ART job. On May 21, 1998, Dr. Pugsley wrote a letter addressed to "Dear Sir/Madam" in which he stated that he had reviewed the ART job description which "seems to fit well within [plaintiff's] restrictive limits. I would, however, ask that if he were to lift more than thirty pounds on a regular basis that he be allowed to have assistance with another worker." (Def.'s Ex. 15.) Likewise, Dr. Cherry wrote that plaintiff should be able to perform this job. (Pl.'s Ex. 11.) Plaintiff included these letters with his application for the position. Ms. Tourjee in Employee Relations testified that Pfizer could not have reasonably accommodated Dr. Pugsley's request for assistance with lifting over thirty pounds because lifting was such a huge percentage of the workday that such an accommodation would have essen-

tially required two people to do one person's job. (Tourjee Dep. at 124.) However, she also testified that Pfizer had gone to great lengths to provide assistance to employees with lifting, such as developing a pneumatically-operated pallet lifter that would enable people to more easily reach pallets without bending and twisting, and providing devices to employees in Animal Resources that would assist them in lifting heavy glassware. (*Id.* at 28, 30.)

On June 8, 1998, in connection with his workers' compensation claim, plaintiff was sent to Dr. Melville Roberts, a neurosurgeon, for an independent medical evaluation ("IME") concerning his back. Dr. Roberts found no objective evidence that plaintiff suffered any disability whatsoever as a result of the 1997 incident involving his back. He concluded that "[plaintiff] is fully capable of full time work provided he does not lift over 25 lbs. and avoids activities that require repeated bending or twisting." (Def.'s Ex. 18.) On August 18, 1998, plaintiff was sent to Dr. Richard Linburg for a second IME of his carpal tunnel syndrome. Dr. Linburg stated that, in his opinion, plaintiff had reached maximum medical improvement. He noted, in his report, that "[a] new job is in the offering at Pfizer involving animal handling, which is not significantly physical. He feels he can do it, and his treating physicians agree.... The description of his upcoming job sounds appropriate, as I would be reluctant to return Mr. Hill to a heavy repetitive use activity with these extremities, considering his recurrent symptomatology on the right." (Def.'s Ex. 19.)

On August 19, 1998, plaintiff was offered the ART position contingent upon his passing a work capacity test, which was required of all candidates. (Pl.'s Ex. 14.) Ms. Tourjee, who was the Employee Relations' contact for the ART position, testi-

fied that she had first-hand knowledge of the requirements of the ART position, and that she was aware that plaintiff had been on a leave of absence for a back injury at the time they made him this offer. (Tourjee Dep. at 32, 34, 46.) She knew plaintiff well and knew that he had been out on disability. (*Id.* at 57, 73.)

Dr. Donald Kent, an in-house Pfizer physician, requested that plaintiff provide Health Services with a letter from his treating physician indicating whether or not he was able to perform the essential duties of the job with or without reasonable accommodation. Dr. Kent also stated that plaintiff was required to complete a fitness capacity evaluation by their ergonomist. (Pl.'s Ex. 17.) Plaintiff submitted the two letters from Drs. Cherry and Pugsley, and on September 30, 1998, he saw Dr. Kent for a physical examination. Dr. Kent noted that, at that time, plaintiff had no complaints referable to his back or hands. He concluded that further information was needed to assess plaintiff's functional ability to perform the tasks of the ART position, including information from Drs. Pugsley, Cherry, Roberts, and Lindburg as to "functional capability demands of job;" information from Connecticut Vocational Rehabilitation as to their assessment of plaintiff; a functional capacity assessment; and information from Pfizer manufacturing as to the functional requirements of plaintiff's prior position, which plaintiff never returned to and which he could not perform. (Pl.'s Ex. 15.) The next day, however, prior to having received any of this information, Dr. Kent concluded that plaintiff was not functionally able to perform the ART position. In his records of October 1, 1998, he wrote:

> Upon review of results of 9/30/98 physical examination and review of history as obtained plus review of record provided by employee, it would be my decision that because of permanent partial dis-

abilities and restrictions placed because of same relative to low back pain and carpal tunnel, post surgery residua, *this prospective employee does not have the functional ability to meet the functional requirements of the position in question and in view of having accommodation already having been made on this position, would not be able to meet such physical functional requirements and is thereby not qualified for hire for this position for which he is being considered.*

(Pl.'s Ex. 15 (emphasis added).) It is unclear what Dr. Kent meant by "accommodation already having been made," and he was unable to shed any light on this statement during his deposition.

On October 15, 1998, Dr. Cherry saw plaintiff for his last follow-up visit for his carpal tunnel syndrome. Noting dramatic improvement in plaintiff's hands, he stated that plaintiff could return to lifting loads in the 60+ pound range on a frequent basis. He stated that he had received inquiries from Pfizer about plaintiff's ability to perform the ART position, to which he responded that he thought plaintiff would be able to do the job without risk of reactivation of his injury or carpal tunnel syndrome in his hands. "The type of activities in the Animal Resources Technician job analysis can all be done without any restrictions or reservations and he may begin this at any time." (Pl.'s Ex. 45.) Dr. Cherry stated that he felt so strongly about this as to suggest that the functional capacity test could be omitted. A copy of this report was sent to Pfizer. (*Id.*)

On October 28, 1998, Dr. Kent wrote Pfizer's Employee Resources that based upon his examination of plaintiff and review of plaintiff's medical records and letters from attending physicians, he felt that plaintiff did not meet the "functional re-

quirements required as an animal handler at this facility, with or without accommodation." (Def.'s Ex. 27.) A work capacity test was never performed. (Pl.'s Ex. 4, ¶ 35.)

On November 18, 1998, David Angel, Senior Advisor of Employee Resources, wrote plaintiff retracting the offer of employment based exclusively on Dr. Kent's letter. (Def.'s Ex. 29; Angel Dep at 13, 41–42.) Mr. Angel testified, based on his familiarity with the essential requirements of the ART position, that frequent, repeated lifting by each employee on his own was an essential function of the job; a large part of the lifting would have to be done by hand, such as lifting dogs of various sizes; and frequent lifting and moving of animal cages, animal feed bags, and other items were required. He did state, however, that lifting devices were available to assist employees in lifting for certain activities, but not all. (Angel Dep. at 26–28.)

In the meantime, in May of 1998, plaintiff had also applied for a Building Services Technician position ("BST"), which was a janitorial position. The posting stated that experience in floor maintenance was highly desirable (Pl.'s Ex. 21), which experience plaintiff had from working for his brothers' commercial janitorial business. (Pl.'s Ex. 4, ¶ 41.) Plaintiff was not hired for this position.

Again, in 1999, plaintiff twice requested to be considered for a Building Services–Lab Support Technician position. Heavy commercial cleaning responsibilities were also an essential function of this job. John Newendorf, whom Pfizer claimed to be the more qualified, was chosen over plaintiff. Pfizer cited to Mr. Newendorf's commercial floor maintenance experience. Plaintiff, however, also had commercial janitorial experience, which he disclosed to Pfizer in his application.

In the summer of 1999, when plaintiff had been on disability for two years, CIGNA began a re-evaluation of plaintiff's disability status. Based upon his January 1998 examination of plaintiff, Dr. Pugsley wrote CIGNA:

It is my strong preference that [plaintiff] be confined to sedentary employment. In this respect please see my note of January 13, 1998.

Reviewing the job description ... of an animal resource technician I have some real concerns about his lifting up to fifty pounds. If he could have someone else helping him do this sort of lifting then I would be less concerned about it, but if it were purely his own responsibility without help then I would personally not be enthusiastic about his doing it because of risk of reinjury.

(Pl.'s Ex. 42.) Dr. Pugsley also completed a Physical Ability Assessment form for CIGNA, stating that plaintiff could continuously lift or carry 10 pounds, but never anything over that. (Def.'s Ex. 32.)

On August 3, 1999, at the request of CIGNA, Dr. Pugsley examined plaintiff and reported that his

status is unchanged.... The patient states that the animal lab technician work was withdrawn from the table as a job offer because of the heavy lifting entailed. He is looking at laboratory technician work with the main activity being cleaning and preparing the lab ware for use. This would entail minimal lifting. He is also looking at security where he would be simply driving people but not actually enforcing security and would not be in harms way having to fight or restrain people.

(Pl.'s Ex. 41.) Dr. Pugsley's impression was that plaintiff was neurologically about the same and there was no change in diagnosis or restrictions. (*Id.*)

On October 6, 1999, CIGNA referred plaintiff for a functional capacities assessment. The assessment report concluded that plaintiff was capable of working eight-hours per day in the "heavy" category of work, based on the Dictionary of Occupational Titles ("DOT") classifications. (Pl.'s Ex. 26.) CIGNA referred these results to Dr. Pugsley for review and comment. Dr. Pugsley stated that he disagreed with the findings and felt that his assessment that plaintiff should perform only sedentary work was much safer and more realistic. (Pl.'s Ex. 43.) CIGNA also referred plaintiff to a rehabilitation specialist for a Transferrable Skills Study. The resulting report dated November 8, 1999, listed six positions that would "take most advantage of Mr. Hill's skills, education, and physical abilities, and meet the salary requirements for resolution of this claim." One of the jobs, fermenter operator, was the same job plaintiff had occupied at the time of his back injury. (Pl.'s Ex. 26.)

CIGNA also referred plaintiff's medical records to Dr. Stanislaw K. Toczek for an independent records review. Dr. Toczek's report, dated November 11, 1999, states that plaintiff had improved, he was motivated to return to work, and the work capacity assessment qualified him to return to heavy work. Dr. Toczek felt that plaintiff could handle weights up to 50 pounds or more. (Pl.'s Ex. 25.)

Ultimately, on November 23, 1999, CIGNA wrote plaintiff that he was no longer eligible to collect long-term disability benefits, since he was no longer "totally disabled" as that term is defined in Pfizer's long-term disability policy, because he was deemed able to perform light duty work, at the very least. (Pl.'s Ex. 26.)

In February and March of 2000, plaintiff again applied for several newly posted ART positions. Pfizer advised him that he would not be considered for these positions because he lacked prior animal handling experience. This was a new requirement allegedly added by Pfizer in early 1999. Plaintiff, however, states that he is aware of other employees holding ART positions, who were hired about the time that he applied and who did not have prior animal handling experience, although he cannot be sure exactly when they were hired.

Plaintiff was never hired by Pfizer for any of the positions for which he applied, nor was he hired for or re-assigned to any of the positions for which CIGNA's transferrable skills study indicated he would be qualified. Plaintiff states that his back condition has improved to the point that the medical records concluding that he was capable of heavy manual labor are accurate. In fact, plaintiff ultimately went to work for his brother's janitorial company doing work at Pfizer as an outside contractor.

### Discussion

### I. Count I—ADA—Disability Discrimination

The ADA prohibits an employer from discriminating against a qualified individual because of a real or perceived disability:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). "Disability" is defined by the ADA as: (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. 42 U.S.C.

§ 12102(2). The implementing regulations include lifting within the definition of "major life activities." 29 C.F.R. pt. 1630, app. § 1630.2(i). Thus, the statute gives a plaintiff three alternative avenues to prove that he is disabled. Plaintiff relies on the third definition of "disabled,"[2] *i.e.,* that he was regarded by Pfizer as having a physical impairment that substantially limited one or more of his major life activities. 42 U.S.C. § 12112(a). The Regulations elaborate upon the ADA's definition of when an individual is "regarded as" disabled, and provide as follows:

*Is regarded as having such an impairment means:*

(1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;

(2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

(3) Has none of the impairments defined [by the EEOC regulations] but is treated by a covered entity as having a substantially limiting impairment.

29 C.F.R. § 1630.2(1);[3] *see also Sutton v. United Air Lines,* 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). "Thus, an individual may fall under the definition of one regarded as having a disability if an employer ascribes to that individual an inability to perform the functions of a job because of a medical condition when, in fact, the individual is able to meet the job's duties." *Ross v. Campbell Soup Co.,* 237 F.3d 701, 706 (6th Cir.2001).

We analyze claims of intentional discrimination under the ADA under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see Regional Econ. Cmty. Action Program, Inc. v. City of Middletown,* 294 F.3d 35, 48 (2d Cir.), *cert. denied,*—— U.S. ——, 123 S.Ct. 74, 154 L.Ed.2d 16 (2002).

In order to survive a motion for summary judgment on a discrimination claim under the ADA, a plaintiff must establish a *prima facie* case of discrimination by producing sufficient evidence to support an inference of discrimination. *See Wernick v. Federal Reserve Bank of N.Y.,* 91 F.3d 379, 383 (2d Cir.1996); *Ryan v. Grae & Rybicki, P.C.,* No. 96CV3731, 1996 WL 680256, at *3 (E.D.N.Y. Nov.13, 1996), *aff'd,* 135 F.3d 867 (2d Cir.1998). "The burden of proof that must be met to permit an employment-discrimination plaintiff to survive a summary judgment motion at the prima facie stage is *de minim[i]s.*" *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 37 (2d Cir.1994) (alterations in original) (internal citations and quotation marks omitted); *see also Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 94 (2d Cir.), *cert. denied,* 534 U.S. 951, 122 S.Ct. 348, 151 L.Ed.2d 263 (2001). For a plaintiff to establish a prima facie case of discrimination because of an employer's failure to provide a reasonable accommodation, the plaintiff must show (1) that he is an individual who has a disability within the meaning of the ADA, (2) that an employer covered by the statute had notice of his disability, (3) that with reasonable ac-

**2.** *See* Note 1, *supra.*

**3.** *See also* 29 C.F.R. pt. 1630, app. § 1630.2(*l*), which gives as an example of a perceived disability:

[S]uppose an employee has controlled high blood pressure that is not substantially limiting. If an employer reassigns the individ-

ual to less strenuous work because of *unsubstantiated* fears that the individual will suffer a heart attack if he or she continues to perform strenuous work, the employer would be regarding the individual as disabled.

commodation, he could perform the essential functions of the position sought, and (4) that the employer has refused to make such accommodations. *Stone v. City of Mt. Vernon,* 118 F.3d 92, 96–97 (2d Cir. 1997) (citation omitted).

Once the plaintiff has established a prima facie case, the defendant must proffer a legitimate, non-discriminatory reason for the adverse action. If it does so, then the burden shifts back to the plaintiff to demonstrate pretext. *Slattery,* 248 F.3d at 94.

Specifically, to meet his prima facie burden under the ADA, plaintiff must show that: (1) he is a disabled person under the ADA; (2) he is otherwise qualified to perform the job; and (3) he suffered adverse employment action because of his disability. *See Heilweil v. Mt. Sinai Hosp.,* 32 F.3d 718, 721–22 (2d Cir.1994), *cert. denied,* 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995) (decided under the Rehabilitation Act); *Dipol v. N.Y. Transit Auth.,* 999 F.Supp. 309, 312 (E.D.N.Y. 1998); *see also Rizzo v. Children's World Learning Ctrs., Inc.,* 84 F.3d 758, 762 (5th Cir.1996).

Defendant argues that plaintiff cannot carry his burden of proving that he was perceived as disabled by any of the decision makers at Pfizer or that any of these individuals were motivated by such perception in making any of the employment decisions of which plaintiff complains. (Def.'s Mot. at 2.) Alternatively, defendant asserts that, even if this Court finds that Pfizer regarded him as disabled, plaintiff cannot demonstrate that he would have been able to perform any of the jobs with or without reasonable accommodation. (*Id.*)

### A. Was Plaintiff "Regarded As" Disabled?

■ Plaintiff admits that he does not have an impairment that substantially limits him in any major life activity but claims that he was regarded as disabled by Pfizer in the major life activity of lifting. "An individual need not actually have a physical impairment to state a claim under the ADA ... as long as that individual is 'regarded as having such an impairment.'" *Francis v. City of Meriden,* 129 F.3d 281, 284 (2d Cir.1997): "Rather, an individual is covered by the 'regarded as' prong of the definition of disability in the ADA ... if he 'has none of the impairments defined in [the definition of the term 'impairment'] but is treated by a covered entity as having a substantially limiting impairment.'" (*Id.*) (quoting 29 C.F.R. § 1630.2(*l*)). "The breadth of the Act's protection is the embodiment of its drafters' will to stamp out the stereotyping of and discrimination against persons with disabilities in all their forms, even when that stereotyping is misplaced." *Ross,* 237 F.3d at 706.

In determining whether an individual may invoke the protection of the ADA when that individual proceeds under a "regarded as" theory, the Second Circuit has held that we must look to the state of mind of the employer. *Francis,* 129 F.3d at 284; *see also Colwell v. Suffolk County Police Dept.,* 158 F.3d 635, 646 (2d Cir.1998), *cert. denied,* 526 U.S. 1018, 119 S.Ct. 1253, 143 L.Ed.2d 350 (1999). "Under the 'regarded as' prong of the ADA, membership in the protected class becomes a question of intent." *Ross,* 237 F.3d at 706. The question of intent is "one rarely susceptible to resolution at the summary judgment stage." *Id.*

Plaintiff has presented sufficient evidence to create genuine issues of material fact concerning his claim that Pfizer regarded him as having an impairment that substantially limited him in the major life activity of lifting. There is no question that decision makers at Pfizer were aware that plaintiff had suffered a back injury,

that he had been out of work on disability, and that he had received workers' compensation benefits. Plaintiff's personnel file contains several references to his receipt of workers' compensation benefits. (Pl.'s Ex. 18.) In fact, one of the references mentions an upcoming hearing for an award of permanent partial disability and then suggests that there are three options to be considered thereafter: "Option: back to work, term, LTD," which we interpret as "back to work, termination, or long-term disability."

Ms. Tourjee, the Employee Relations' contact person for the first ART position for which plaintiff applied, testified that she had known plaintiff for a long time, she had worked with him, and she was aware that he had a back injury and had been out of work on a leave of absence. David Angel, who took Ms. Tourjee's position and rescinded the offer of employment to plaintiff, testified that his decision was based exclusively on the report of Dr. Kent, Pfizer's in-house doctor. Dr. Kent had obtained and reviewed plaintiff's medical records concerning his back injury and carpal tunnel syndrome, as well as the reports from the IME doctors. He considered plaintiff unable to perform the essential functions of the job because of his "permanent partial disabilities and restrictions placed on [him] relative to [his] low back pain and carpal tunnel." (Pl.'s Ex. 15.) Based on Dr. Kent's opinion that plaintiff was disabled, defendant revoked the job offer to plaintiff. Thus, we are hard-pressed to understand defendant's argument that there is no factual issue that Pfizer's decision makers did not regard plaintiff as disabled.

The fact that Tourjee and Angel may not have been aware of the "particulars of Hill's medical condition or prior medical condition" (Def.'s Mem. at 28) does not negate the fact that they were aware of

plaintiff's history of medical problems and that the decision to rescind the job offer was made solely on the basis of Pfizer's doctor's opinion that plaintiff was unable to perform the essential functions of the job. Indeed, even in its response to plaintiff's CCHRO complaint, Pfizer stated that plaintiff was not "capable" or qualified to perform the duties of the ART position. (Pl.'s Ex. 29, Sch. A., Def.'s Response to ¶ 7 of Pl.'s CCHRO Compl.)

Thus, we conclude, contrary to defendant's position, that plaintiff has proffered sufficient evidence from which a reasonable jury could conclude that defendant regarded plaintiff as substantially limited in his ability to lift, a major life function, due to his carpal tunnel syndrome and/or back injuries.

### B. Was Plaintiff's Disability a Motivating Factor in Defendant's Decisions Not to Hire Him?

■ Defendant next argues that plaintiff cannot carry his prima facie burden of showing that his disability was a motivating factor in defendant's decisions not to hire him.

We begin by reiterating the *de minimis* burden that plaintiff carries at this prima facie stage of the case. *See Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir.2001); *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 153–54 (2d Cir. 2000). Additionally, the Second Circuit has repeatedly cautioned that where intent is an issue, the courts should be particularly wary about granting summary judgment. *See Chertkova v. Conn. Gen. Life Ins.*, 92 F.3d 81, 87 (2d Cir.1996); *Chambers*, 43 F.3d at 37; *Gallo*, 22 F.3d at 1224.

With respect to plaintiff's rejection for the ART position, the evidence is uncontradicted that the decision was based exclusively on Dr. Kent's opinion that plaintiff was not able to perform the essential

functions of the job. Thus, clearly, plaintiff's disability (whether perceived or otherwise) was a motivating factor in this decision.

Under the ADA, an employer may withdraw a conditional job offer for reasons that are "job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(3)(c); 29 C.F.R. § 1630.14(b)(3). Moreover, the employer may only withdraw the conditional offer if "performance of the essential job functions cannot be accomplished with reasonable accommodation." 29 C.F.R. § 1630.14(b)(3).

Here, plaintiff's offer was withdrawn based on the opinion of Dr. Kent, which was contrary to that of plaintiff's treating physicians, and which was rendered prior to plaintiff's taking the required work capacity test and prior to Dr. Kent's receipt of any of the records and information that he thought were needed. Additionally, there is no evidence that any consideration whatsoever was given to Dr. Pugsley's request for a lifting accommodation for plaintiff.

As for his rejection for the Building Services Technician positions, plaintiff has presented sufficient evidence that he was qualified for the job. He had past commercial janitorial experience and is presently working at Pfizer for his brother's janitorial company. Although Pfizer has asserted that the individual selected was more qualified, plaintiff has presented sufficient evidence to raise a triable issue of fact that he was as qualified. Thus, there are genuine issues of material fact as to whether Pfizer's rejection of plaintiff was a pretext for discrimination against him because of a perceived disability.

With respect to plaintiff's second application for the ART position, where defendant had allegedly added the requirement that applicants have prior animal handling experience, again we find genuine issues of material fact. This required qualification was never added to the job posting announcement. It is unclear whether it was a formal requirement or simply a desirable qualification. Moreover, plaintiff has presented sufficient evidence to create issues of fact as to whether other persons were hired about the same time who did not have such prior experience. Thus, we find genuine issues of material fact as to whether plaintiff's perceived disability was a motivating factor in his not being hired for this position, which he had previously been found qualified to fill.

### C. Was Plaintiff Otherwise Qualified?

■ Under the ADA, plaintiff must prove that he was otherwise qualified to perform the job in question. 42 U.S.C. § 12111(8). A "qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

Defendant's final argument is that even if plaintiff was regarded as disabled, he cannot prove that he was otherwise qualified for the positions at issue, with or without reasonable accommodation. Again, we find that plaintiff has presented sufficient evidence to create genuine issues of material fact in that regard.

The one thing that is readily apparent from a review of the record is that there were a multitude of differing opinions from plaintiff's treating physicians, his IME doctors, and the in-house physician concerning his functional capabilities at varying points in time. At the time Pfizer offered plaintiff the ART position, subject to his passing a work capacity test, both

of his treating physicians were of the opinion that he could perform the essential functions of the job with certain accommodations. Dr. Pugsley had requested assistance in lifting over 30 pounds as an accommodation for plaintiff. Dr. Cherry indicated that plaintiff should avoid repetitive lifting, overhead work greater than 20 pounds, and no vibratory tools. Additionally, the two IME doctors had reported that plaintiff was "fully capable of full time work provided he does not lift over 25 lbs. and avoids activities that require repeated bending or twisting," (Def.'s Ex. 18), and that the new job sounded appropriate for him. (Def.'s Ex. 19.) Pfizer's in-house doctor, Dr. Kent thought otherwise, although he noted that additional information was necessary. Yet, without the benefit of any of this additional information, and prior to an evaluation of plaintiff by Pfizer's ergonomist, Dr. Kent concluded that plaintiff was not qualified for the ART position because he did not have "the functional ability to meet the functional requirements of the position." (Pl.'s Ex. 15.) In the meantime, Dr. Cherry, saw plaintiff and concluded that he should be able to perform the ART position "without any restrictions or reservations and he may begin this at any time." (Pl.'s Ex. 45.) He felt so strongly about this that he suggested that the functional capacity test did not need to be performed. Nevertheless, Pfizer revoked plaintiff's offer of employment for the ART position based exclusively on Dr. Kent's letter. (Angel Dep. at 13.)

Based on the evidence of record, particularly when viewed in the light most favorable to plaintiff, we find genuine issues of material fact as to whether plaintiff was capable of performing the ART position with reasonable accommodation.

With respect to plaintiff's second application for the ART position, by that point in time, plaintiff had taken a work capacity test in connection with his receipt of long-term disability benefits. The results of that test indicated that plaintiff could lift in the heavy category of work and was capable of performing jobs in the heavy category of work per DOT classifications. (Pl.'s Ex. 26.) Plaintiff also underwent a transferrable skills analysis, which listed six positions plaintiff should be capable of performing, included his former position. (Pl.'s Ex. 23.) Additionally, an IME by Dr. Toczek indicated that plaintiff was qualified to do heavy work, handling weights up to 50 pounds. (Pl.'s Ex. 25.) Based upon these reports, CIGNA cancelled plaintiff's long-term disability benefits.

Given these findings, as well as the fact that the ART position was previously offered to plaintiff subject to his passing a work capacity test, there is substantial evidence in the record to support plaintiff's position that he was physically capable of performing the ART position. Defendant maintains that he was no longer qualified because of its new requirement of prior animal handling experience. This requirement of prior animal handling experience, however, was not stated on the posting for the ART position and there is conflicting testimony in the record as to whether it was a formal requirement for the job or just something that was preferred. (Angel Dep. at 57–58; Tourjee Dep. at 74, 115.) Additionally, plaintiff believes others were hired at about the same time without the requirement of prior animal handling experience. Because there is conflicting evidence as to whether this was a firm requirement when plaintiff reapplied for this position, we find issues of fact as to whether he was qualified, thus precluding the grant of summary judgment in defendant's favor.

## II. Count II—CFEPA—Disability Discrimination

■ In Count II, plaintiff alleges that defendant's conduct violated Connecticut's Fair Employment Practices Act ("CFEPA"), Conn. Gen.Stat. §§ 46a–51(15) and 46a–60. Unlike many of the other state discrimination statutes, the disability discrimination provisions of CFEPA do not mirror the federal ADA. To be "disabled" under Connecticut law is different than being "disabled" under the ADA. *Shaw v. Greenwich Anesthesiology Assocs.*, 137 F.Supp.2d 48, 65 (D.Conn.2001). "Physically disabled" is defined under the CFEPA, Conn. Gen.Stat. § 46a–51(15), as "any individual who has any chronic physical handicap, infirmity or impairment, whether congenital or resulting from bodily injury, organic processes or changes or from illness, including, but not limited to, epilepsy, deafness or hearing impairment or reliance on a wheelchair or other remedial appliance or device." Although not specifically set forth in the statute, perceived disabilities have been held by the Connecticut courts to constitute a "disability" under the CFEPA. *Shaw*, 137 F.Supp.2d at 66, n. 22; *Ann Howard's Apricots Rest. Inc. v. Comm'n on Human Rights & Opportunities*, 237 Conn. 209, 224–25, 676 A.2d 844 (1996). The CFEPA has also been interpreted to require an employer to reasonably accommodate disabled employees. *Trimachi v. Conn. Workers' Comp. Comm.*, No. CV 970403037, 2000 WL 872451 (Conn.Super.2000).

For the same reasons discussed above, we find genuine issues of material fact as to whether plaintiff was perceived as disabled at the time he was rejected for the positions at issue, whether defendant failed to accommodate his disability, and whether plaintiff was discriminated against on the basis of a perceived disability, in violation of the CFEPA, thus precluding the grant of summary judgment in favor of Pfizer on Count II.

## III. Count III—Workers' Compensation Retaliation

In plaintiff's third count, he raises a different theory of discrimination. He asserts that Pfizer retaliated against him for filing workers' compensation claims by (1) thwarting his efforts to secure continued employment with defendant; (2) failing to transfer him to full-time work suitable to his physical condition when such work was available; and (3) ultimately discharging him.

Defendant argues that it is entitled to summary judgment on plaintiff's retaliation claim because there is no evidence that any of the decision makers were aware of plaintiff's receipt of workers' compensation benefits when the employment decisions were made or that they were motivate by a purported knowledge of same.

■ To make out a prima facie case of retaliatory discharge in violation of Conn. Gen.Stat. § 31–290a, a plaintiff must establish (1) that he has filed a claim for workers' compensation benefits or otherwise exercised his rights under Chapter 568 of the Connecticut General Statutes; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action. *Hill v. Pinkerton Sec. & Investigation Servs., Inc.*, 977 F.Supp. 148, 158 (D.Conn.1997). There is no question in this case as to the first two elements. The critical element is the causal connection between plaintiff's workers' compensation claims and defendant's refusal to rehire or transfer him to one of the positions for which he applied.

■ There were references in plaintiff's personnel file to his receiving workers' compensation benefits. Notations for Jan-

uary 12, 1998, indicate the amount of "worker's comp" he was receiving, followed by a notation of "last check for worker's comp" "through 5.15.98 no more worker's comp." "Comm. accepted Pfizer's request that we not pay any more. Attorney did not fight this. June 3rd hearing w/ commissioner. Award permanent partial disability. Option: back to work, term, LTD." (Pl.'s Ex. 18.) The 6/3/98 entry states "thinks he's going to get a lump sum next week?" (*Id.*) Therefore, we place no credence in defendant's statements that it was not aware that plaintiff was receiving worker's compensation.

Although Dr. Kent professed ignorance of the fact that plaintiff had been collecting workers' compensation and disability benefits, (Kent Dep. at 56, 66–72), his notes belie this assertion. His progress notes refer to the fact that plaintiff has been out of work for sixteen months due to a "major disabling condition," that he hurt his back after lifting a 60–pound weight at work, that he had received permanent disability ratings and had been referred to Connecticut Vocational Rehabilitation Services for employment evaluation. (Pl.'s Ex. 15.) A reasonable jury could infer from these notations that a company doctor would know, or should have known, that plaintiff was receiving workers' compensation benefits as a result of these work-related injuries, the attendant leave of absence, and the permanent disability ratings.

The more difficult question is whether there is any evidence that plaintiff's receipt of workers' compensation benefits was a motivating factor in defendant's decisions not to rehire him. The most incriminating piece of evidence is the notation in plaintiff's personnel file concerning the options that were being considered or available after the hearing on plaintiff's lump-sum award for his partial permanent disability ratings: "Option: back to work, term, LTD." Thereafter, plaintiff was re-

peatedly rejected for job after job with defendant despite his long history of employment with Pfizer.

In its motion for summary judgment defendant states: "[T]he record in this case, primarily based on Plaintiff's own admissions and actions, will establish only that Plaintiff suffered from unfortunate impairments over the years, and obtained every available means of financial compensation from Defendant, from the Defendant's disability insurance carrier, and from the workers' compensation carrier, for those impairments." (Def.'s Mot. at 2–3.) Although counsel suggests the exhaustion of these benefits as a motive for plaintiff's bringing this lawsuit, a jury could just as easily infer that it was plaintiff's receipt of all these benefits that led defendant to decide it no longer wanted him on its payroll.

We cannot say based on the record before us, when construed in the light most favorable to plaintiff, that a reasonable jury could not find a causal connection between plaintiff's receipt of workers' compensation and the adverse employment actions taken against him. Therefore, we deny defendant's motion for summary judgment as to Count III.

### Conclusion

For the foregoing reasons, defendant's motion for summary judgment [Doc. # 24] is DENIED. This case will be placed on the August Trial Calendar. A Ready Trial Notice will issue forthwith. Should the parties desire a follow-up settlement conference with Magistrate Judge William I. Garfinkel prior to trial, they should contact his Chambers directly to schedule this conference well before the trial date.

**SO ORDERED.**